# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

United States of America,

|                       |                       |                                                  |
|-----------------------|-----------------------|--------------------------------------------------|
|                       | Plaintiff,            | Crim. No. 11-141 (1) (RHK/JJK)                   |
|                       |                       | Civ. No. 14-4202 (RHK)                           |
|                       |                       | **MEMORANDUM OPINION AND ORDER**                 |
| v.                    |                       |                                                  |
| Frank Elroy Vennes, Jr., |                    |                                                  |
|                       | Defendant.            |                                                  |

Kimberly A. Svendsen, Timothy C. Rank, Assistant United States Attorneys, Minneapolis, Minnesota, for the Government.

William J. Mauzy, Casey T. Rundquist, Law Office of William J. Mauzy, Minneapolis, Minnesota, for Defendant.

In April 2011, a grand jury indicted Defendant Frank Elroy Vennes, Jr. on four counts of securities fraud and one count of money laundering in connection with investments he solicited in the massive Ponzi scheme spearheaded by Tom Petters. The grand jury later returned a Second Superseding Indictment charging him with 28 counts of securities fraud, wire fraud, mail fraud, bank fraud, and money laundering, among other crimes. After extensive preparation and pretrial motion practice, his trial was scheduled to commence on February 5, 2013.

On February 1, 2013, however, Defendant entered into a plea agreement (the "Plea Agreement") (Doc. No. 167) with the Government in which he agreed to plead guilty to one count of securities fraud and one count of money laundering. The Court accepted his

guilty plea, and on October 18, 2013, sentenced him to 15 years' imprisonment, the statutory-maximum penalty.  Defendant did not appeal.

On October 4, 2014, nearly two years after he pled guilty and almost a year after he was sentenced, Defendant for the first time claimed the Government had made certain promises to him, not contained in the Plea Agreement, to which it did not adhere.  He also asserted that his lead defense counsel, James Volling, Esq., failed to provide effective assistance because he did not object to the Government's alleged malfeasance and misrepresented his likely sentence in private discussions with Defendant.  As a result, he filed the instant Motion under 28 U.S.C. § 2255, seeking to withdraw his guilty plea.  Having carefully considered the parties' robust briefing, the Motion will be denied.

## BACKGROUND

The facts recited below are taken from the docket in this matter and from Defendant's Motion.

Shortly after being charged, Defendant retained Volling to represent him.  Volling is an attorney with more than 30 years' experience, a partner at Faegre Baker Daniels, one of the largest law firms in Minneapolis, and a former law clerk to United States Supreme Court Justice Warren E. Burger.  Notably, Volling had been representing Defendant for more than two years before he was indicted, in connection with civil matters comprising part of the Petters proceedings.  Defendant and Volling have known each other since the early 1990s, due to their work together on the board of a Minnesota-

based prison ministry.  Hence, as Defendant puts it, he had "a level of trust with

Mr. Volling [he] would not have with [another] lawyer."  (Decl. ¶ 4.)[1]

Volling (and several other lawyers from his firm) quickly undertook a spirited and

vigorous defense.  He filed a bevy of motions, including a motion to sever and a motion

for a bill of particulars.  He reviewed the massive collection of documents the

Government had mustered during its investigation.  As the February 5, 2013 trial date

approached, he filed a slew of additional motions, including a number of motions in

limine.  At no point along the way did Defendant express any willingness to plead guilty.

(Id. ¶¶ 6-7, 9, 11; Volling Aff. ¶ 4.)

But with trial looming, things changed in mid-January 2013.  After receiving the

Government's trial exhibits and Jencks Act disclosures, Volling and Defendant discussed

the possibility of a plea deal, and Defendant authorized Volling to confer with Assistant

United States Attorney Timothy Rank.  (Decl. ¶ 11.)  On January 29, 2013, Defendant

and Volling met to discuss an offer Rank had made.  It is undisputed the offer was for

Defendant to plead guilty to two counts (securities fraud and money laundering) with a

statutory maximum penalty of 15 years' imprisonment, in exchange for the Government

dismissing the remaining Counts in the Second Superseding Indictment.[2]  According to

---

[1] Defendant has filed two documents styled as a Motion under 28 U.S.C. § 2255:  docket number 377, which is on a pre-printed form, and docket number 378, which appears to be a declaration supporting his request for relief.  Accordingly, the Court refers to docket number 377 as Defendant's Motion (abbreviated "Mot.") and docket number 378 as a Declaration (abbreviated "Decl.").

[2] This would impart a significant benefit to Defendant, as the United States Sentencing Guidelines provided for a life sentence if he were convicted of all of the charges in the Second Superseding Indictment.  (Rank Aff. ¶ 7; see also Presentence Investigation Report ¶ 156.)

Defendant, Volling also informed him that Rank "would not advocate for a particular sentence" and would "tell the court that [he] was less culpable than Robert White," a Petters co-conspirator who received a five-year sentence.  (Id. ¶¶ 12-13.)  Defendant, though, pressed Volling to obtain a better deal because he "feared the possibility of a fifteen year sentence."  (Id. ¶ 15.)  According to Defendant, Volling bristled in response and threatened to withdraw as counsel – with trial approximately a week away – unless he agreed to plead guilty.  (Id. ¶¶ 14-16.)[3]  Nevertheless, Volling contacted Rank a second time but was unable to obtain a better offer; yet, Rank (allegedly) reiterated he would "remain completely mute" at sentencing, other than to inform the Court Defendant was less culpable than White.  (Id. ¶ 17.)  Defendant decided to take the evening to consider Rank's offer and agreed to meet Volling the following day, although at the time he intended to reject the offer and proceed to trial.  (Id. ¶¶ 17-18.)[4]

That night, Defendant discussed the offer with his wife and mother.  (Id. ¶ 19.)  He was reluctant to plead guilty but "concern[ed]" about Volling's (alleged) threat to withdraw – since all of his money had been seized as part of the related proceedings against Petters, he "did not have access to funds to hire a different lawyer and would have to defend [him]self at trial without a lawyer to represent [him]."  (Id.)

---

[3] Volling denies threatening to withdraw, and he correctly notes that such a request, coming on the eve of a very complex trial after more than a year of preparation, likely would have been denied by the Court. (Volling Aff. ¶ 11.)  He acknowledges, however, that in the week leading up to the guilty plea, Defendant angrily criticized certain aspects of his trial preparation, to which Volling responded that the criticism was unfair and Defendant could choose whomever he wished to represent him.  (Id. ¶ 12.)  Defendant then apologized and trial preparation continued. (Id.)

[4] Volling asserts Defendant *did* reject the offer and he so informed Rank.  (Volling Aff. ¶ 7.)

The following morning, Defendant again met with Volling, at which time Volling presented him a letter "memorializing [their] discussions and . . . [his] advice over the last several days" and summarizing a plea agreement Rank had "offered to draft." (Decl. ¶ 20 & Ex. 1.)[5] The letter explained the Government had offered for Defendant to plead guilty to securities fraud and money laundering with a maximum sentence of 15 years' imprisonment, a sentence Volling considered "unlikely" because it would have required the Court to impose consecutive maximums on each of the two counts. (Id. Ex. 1.)[6] The letter continued:

> [T]he Plea Agreement offered by Mr. Rank on January 29 would have contained language expressly acknowledging your lack of knowledge that there was a Ponzi scheme perpetrated by Mr. Petters and others, would have provided that there is no agreement on an amount of loss calculation such that the issue could be creatively argued to the Court, would have stated that the Government would not argue for a particular sentence and instead would simply ask the Court to impose a sentence consistent with the statutory factors, would have allowed me to advocate on your behalf for whatever sentence was deemed appropriate, and would have provided that you should receive the benefit of acceptance of responsibility under the Sentencing Guidelines.[7] In addition, Mr. Rank advised me that he would tell the Court at sentencing that the Government deems you less culpable than Robert White in terms of the overall conduct involved in the Petters fraud.
>
> As we discussed, while the Court would not be a party to the proposed Plea Agreement, given other sentences imposed by the Court, and given the possibility of your cooperation with regard to the pending case against [co-defendant] James Fry and possibly with regard to others, I have

---

[5] Volling claims the meeting occurred on January 31, not January 30. (Volling Aff. ¶ 8.)

[6] The statutory maximum sentence for securities fraud is five years, and the statutory maximum sentence for money laundering is 10 years.

[7] Defendant claims Volling told him the Government had offered "*a full three point credit* for . . . acceptance of responsibility" (Decl. ¶ 20 (emphasis added)), but the January 30 letter mentions only that he would "receive the benefit of acceptance of responsibility."

told you that I believe there is a likelihood that a sentence at the low end of three years and the high end of seven years could be imposed by the Court. Given that Robert White received a sentence of five years, that [Petters co-conspirator] Greg Bell received a sentence of six years, and that the Government will inform the Court that it deems you less culpable than Mr. White; given that strong evidence of your good works and the support of many will be before the Court at sentencing and not opposed by the Government; given that you have significant health issues; and given that you likely will earn maximum good-time credit, I have advised you that I believe a sentence of less than five years is a real possibility under the plea bargain as proposed by Mr. Rank.

(Id.)[8] Defendant asserts that after seeing these "promises" in writing for the first time, and after considering Volling's predictions about a possible sentence, he began to reconsider whether he should plead guilty. (Decl. ¶ 21.) He agreed to meet with Volling again on January 31, 2013, to discuss the matter further.

At that January 31 meeting, Defendant purportedly reviewed a draft of the Plea Agreement; that draft, however, did not contain any of the "promises" discussed above. (Id. ¶ 23.) When he asked about their absence, Volling "assured [him] . . . that . . . Rank could be trusted to abide by the promises contained in [the] January 30 letter." (Id.) Defendant then signed the Plea Agreement, even though he "felt reluctant to" do so. (Id. ¶¶ 23-24.)[9]

---

[8] Rank denies making any of the "promises" contained in Volling's letter, other than agreeing to note in a plea agreement that the Government "was not alleging that Defendant had knowledge of or participated directly in the Petters Ponzi scheme." (Rank Aff. ¶ 8.)

[9] Volling and Rank deny that a draft Plea Agreement existed, because by that point Defendant had rejected the Government's offer. (Volling Aff. ¶¶ 10, 14; Rank Aff. ¶¶ 9, 12.) Rather, they assert a Plea Agreement was drafted only after Defendant informed Volling on February 1, 2013, that he wanted to plead guilty. (Volling Aff. ¶¶ 10, 14; Rank Aff. ¶¶ 11-14.) Notably, the signed Plea Agreement in the record is dated February 1, 2013, and not January 31, 2013, which is consistent with Volling's and Rank's assertions.

Rank, Volling, and Defendant then appeared before the Court for a change-of-plea hearing on the afternoon of February 1, 2013.  During the hearing, Defendant apparently was "not concerned" when Rank asked him to affirm that no promises had been made beyond those in the written Plea Agreement, since Volling had assured him Rank was true to his word.  (Id. ¶ 26.)  Nor did he hesitate to confirm to the Court that no one had made any "promises to get [him] to enter into th[e] plea agreement" and that no one had told him what his sentence would be.  (2/1/13 Hr'g Tr. at 34, 36-37.)  Of particular relevance here, the hearing transcript reveals the following:

> MR. RANK:  Mr. Vennes, I'm showing you a document here.  It's a document that is a 12-page document and it is entitled Plea Agreement and Sentencing Stipulations.  Do you see this document?
>
> THE DEFENDANT:  Yes.
>
> MR. RANK:  And, sir, have you had an opportunity to go through this plea agreement in its entirety with your attorney?
>
> THE DEFENDANT:  I have.
>
> MR. RANK:  Have you had a chance to yourself read through it in detail?
>
> THE DEFENDANT:  Yes.
>
> MR. RANK:  Do you understand what the plea agreement here is doing and what you're entering into here today?
>
> THE DEFENDANT:  Yes.
>
>          *            *            *
>
> MR. RANK:  And you also understand, sir, that there are certain statutory penalties that are associated with the plea that you're entering here today?
>
> THE DEFENDANT:  Yep.

- 7 -

MR. RANK:   And with respect to Count 3 of the indictment [securities fraud], that carries a statutory penalty of imprisonment up to five years . . . . Do you understand that, sir?

THE DEFENDANT:  Yes.

MR. RANK:   Do you also understand that Count 26 of the indictment [money laundering] carries a statutory penalty of up to 10 years . . . . Do you understand that?

THE DEFENDANT:  Yes.

*          *          *

THE COURT:  One of the consequences [of pleading guilty] is it's going to be over.  There's going to be no – nothing you can do about it.  Your plea will be in regardless of whether you take an appeal or you're allowed to take an appeal, but the guilty verdict will be in place.  There's nothing you can do about that.  So there's no way of changing your decision in that regard.

So if during the course of the rest of this hearing here this afternoon there are any questions about this plea agreement that come to your mind for the first time, something that hadn't dawned on you until you started hearing the questions from just being in the courtroom which you would like to talk to Mr. Volling about, or any questions you have of me or any questions of Mr. Rank, you should feel free to ask those questions.  Just let me know, we'll stop, we'll take a recess or whatever we have to do, just so you can talk with counsel or you can ask questions of me.

And there are no – I tell this to every Defendant – there are no dumb questions, there are no silly questions.  Anything that's on your mind that affects this plea agreement you should feel free to ask me.  All you have to do is just raise your hand and we'll try to address whatever those concerns are.

I mention it because if I accept the plea, the time for asking those questions, it's going to be too late after today.  So if you have any reservations about what's in this plea agreement, feel free to let me know that.  Do you understand that?

THE DEFENDANT:  Yes.

- 8 -

\*             \*             \*

MR. RANK:   And lastly, sir, before I get to the factual basis, you understand that this is a complete agreement between the United States and yourself.  Do you understand that?

THE DEFENDANT:  Yes.

MR. RANK:  And is it true that there are no other agreements, promises, representations, or understandings that are getting you to plead guilty here today?

THE DEFENDANT:  Right.

MR. RANK:  Is that correct?

THE DEFENDANT:  Yes.

\*             \*             \*

THE COURT:  Okay.  Mr. Vennes, the plea agreement which you have now signed, and it's been reviewed by the prosecutor, that's an agreement which you have read before you signed it?

THE DEFENDANT:  Yes.

THE COURT:  You read it carefully?

THE DEFENDANT:  Yes.

THE COURT:  You read it more than once?

THE DEFENDANT:  More than twice.

THE COURT:  Talked with your lawyer about it?  Asked him what all these various paragraphs mean?

THE DEFENDANT:  At length.

THE COURT:  As far as you could tell was he able to answer the questions to your satisfaction?

THE DEFENDANT:  Fully.

THE COURT:   Do you believe you understand what's in this plea agreement?

THE DEFENDANT:  Yes, I do.

THE COURT:  Did anybody make any threats or promises to get you to enter into this particular plea agreement?

THE DEFENDANT:  No.

THE COURT:  You did this of your own free will?

THE DEFENDANT:  Yes.

\*          \*          \*

THE COURT: . . . [Y]ou're going to be entering a plea here today not knowing what your sentence is going to be.  Do you understand that?

THE DEFENDANT:  Yes.

THE COURT:  And you won't know until I hear from you or hear from your lawyers.   I'll get sentencing position papers, a Presentence Investigation Report.  Because I don't know what the sentence is going to be, has anybody told you what your sentence is going to be?

THE DEFENDANT:  No.

THE COURT:  So you understand regardless of what that sentence is, you will not be able to appeal – you will not be able to withdraw your plea of guilty.  In other words, even if you don't like the sentence, even if it exceeds the 180 months that we're talking about in this plea agreement, that will not be a basis for you to change your mind about pleading guilty here today.  Do you understand that?

THE DEFENDANT:  Yes.

\*          \*          \*

THE COURT:  In other words, that means that if I sentence you to – the worst case scenario from your standpoint under these circumstances would

be I sentence you to 180 months in prison.  That means you walk out of this courtroom and off to prison.  Do you understand that?

THE DEFENDANT:  Yes.

THE COURT:  With no right to appeal.  You've talked to your lawyer about that?

THE DEFENDANT:  Yes.

(Id. at 5, 7-10, 14, 34, 36-38.)  Defendant then acknowledged the factual bases supporting the charges to which he was pleading guilty.  (Id. at 18-33.)

Following this extended colloquy, the Court accepted Defendant's guilty plea, in the process concluding it was a "knowing, voluntary, conscious decision on his part" and was "made without any threats or promises by the Government."  (Id. at 39.)  The Court then directed the preparation of a presentence investigation report (PSR).

On March 4, 2013, the probation officer submitted Defendant's PSR to the Court, the Government, and Defendant.  It calculated Defendant's total offense level at 43; this included a 2-point reduction for acceptance of responsibility and not three points, as Defendant allegedly had been promised, because he "did not agree to plead guilty until the morning of February 1, 2013 [and] [t]he trial was scheduled to begin on February 5, 2013."  (PSR ¶ 100.)[10]  With a criminal history category of II, the resulting advisory sentence under the Sentencing Guidelines was life imprisonment.  As a result of Defendant's plea, however, that advisory sentence was reduced to 180 months.

---

[10] Despite having received and reviewed the PSR, Defendant claims he "did not realize at the time that the Government's failure to move for an additional, one point deduction for acceptance of responsibility[] violated [its] agreement that I be given full credit for acceptance."  (Decl. ¶ 29.)

And the Government, in its later-filed Sentencing Memorandum (Doc. No. 241), asked for the maximum sentence to be imposed by the Court. According to Defendant, "[t]his was the first indication I had that the Government might not live up to what I perceived as its agreement with me." (Decl. ¶ 30.) But when he inquired of Volling, he was told "not to worry about it because Rank would still abide by the agreement at the sentencing hearing." (Id.) In addition, the Government's Sentencing Memorandum advised that it believed Defendant's fraud was "subtler and more sophisticated than" the one carried out by Petters, but "just as essential to the success of the . . . Ponzi scheme," and that Defendant's charitable contributions did not merit serious consideration by the Court because "it is easy to make charitable contributions with other people's money." (Id. ¶ 31.) According to Defendant, this, too, violated the Government's promises. But neither in his objections to the PSR (PSR at A.1-A.3), nor in his response to the Government's position on sentencing (Doc. No. 288), did Defendant argue or even mention that the Government was breaking its (alleged) promises or seek to withdraw his guilty plea.

The Court held a sentencing hearing on October 18, 2013. At that hearing, Defendant was "shocked" by the Government's presentation, which according to Defendant suggested he knew about the underlying Petters fraud. (Decl. ¶ 32.) Furthermore, according to Defendant, the Government did not "acknowledge . . . that [he] was less culpable than Robert White" or "honor [its] promise to not oppose evidence of [his] good works." (Id.) But when it came time for Defendant to speak, he simply read a statement prepared for him by Volling. (Id.) At no point did he or Volling (or either of

the other two lawyers present from Volling's firm) interject that the Government was deviating from its promises.

After listening to Defendant's allocution and the presentations of counsel, the Court sentenced Defendant to the maximum term of 15 years; he was "stunned" but said nothing.  (Id. ¶ 33.)  The Court informed him that although it did not believe he had the right to appeal (due to the Plea Agreement), if Defendant thought he had a basis to do so, he needed to file his appeal within 14 days.  (10/18/13 Hr'g Tr. at 38-39.)  Defendant never filed an appeal.

Instead, on October 4, 2014 – nearly a year after he was sentenced, and with the deadline for habeas relief fast approaching[11] – Defendant filed the instant Motion, asserting four claims:

- A due-process violation, based on the Government's alleged "failure to honor its promises."  (Mot. at 5.)

- Ineffective assistance of counsel, because Volling failed to object to the Government's alleged malfeasance.  (Id. at 6.)

- Ineffective assistance of counsel, due to Volling's "false and misleading statements about the nature of the Plea Agreement, his threat of withdrawal, and his grossly inaccurate predictions about the sentencing outcome."  (Id. at 7.)

- Volling's threat to withdraw rendered Defendant's plea involuntary, entitling him to withdraw it.  (Id. at 9.)

---

[11] Section 2255 sets a one-year limitation period for habeas petitions, which runs from "the date on which the judgment of conviction becomes final."  28 U.S.C. § 2255(f).  Because Defendant did not file an appeal, and because his judgment of conviction was entered on October 22, 2013, the deadline for seeking habeas relief was November 5, 2014, one year from the date the judgment of conviction became final.  See Fed. R. App. P. 4(b)(1)(A)(i) (criminal defendant has 14 days after judgment enters to file notice of appeal).

The Government has filed a lengthy response to the Motion, to which Defendant has filed a Reply.  Defendant additionally filed a request for discovery, which has also been fully briefed.  The Motion and request for discovery are ripe for disposition.

## STANDARD OF DECISION

Title 28 U.S.C. § 2255(a) provides, in relevant part, that a

> prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released [because] the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

Despite its seeming breadth, § 2255 provides a remedy only for jurisdictional or constitutional errors, e.g., Sun Bear v. United States, 644 F.3d 700, 704 (8th Cir. 2011) (en banc); it does not apply to "all claimed errors in conviction and sentencing."  United States v. Addonizio, 442 U.S. 178, 185 (1979).  This is because a criminal trial is "the 'main event' at which a defendant's rights are to be determined," and hence the "Great Writ" of habeas corpus may issue only in those "extraordinary" circumstances in which a court must intervene to right a fundamental wrong.  McFarland v. Scott, 512 U.S. 849, 859 (1994).  In other words, relief under § 2255 "is reserved for transgressions of constitutional rights and for a narrow range of injuries that could not have been raised on direct appeal and, if uncorrected, would result in a complete miscarriage of justice."  United States v. Apfel, 97 F.3d 1074, 1076 (8th Cir. 1996).

Section 2255 provides that a court shall hold a hearing on a motion thereunder "[u]nless the motion and the files and records of the case conclusively show that the

prisoner is entitled to no relief." 28 U.S.C. § 2255(b). This means a § 2255 motion can

be dismissed without a hearing only if "the petitioner's allegations, accepted as true,

would not entitle [him] to relief." <u>Tinajero-Ortiz v. United States</u>, 635 F.3d 1100, 1105

(8th Cir. 2011). As the Court has not held a hearing here, it accepts as true the

allegations in Defendant's Motion and supporting documents. However, the Court need

not (and does not) accept as true those allegations "contradicted by the record, inherently

incredible, or conclusions rather than statements of fact." <u>Id.</u> (citation omitted).

## ANALYSIS

### I.   Due process (Claim 1)

In his first claim, Defendant asserts his due-process rights were violated because

the Government "breached many enforceable, oral promises memorialized in [Volling's]

January 30, 2013 letter." (Decl. ¶ 37.) Specifically, he argues the Government (1) "did

not remain silent at sentencing," but instead "vociferously argued for the maximum

possible sentence," (2) "did not inform the Court [he] was less culpable than Robert

White," (3) did not move for a full 3-point reduction for acceptance of responsibility, and

(4) "did not allow [him] to argue, unopposed[,] about the importance of his charitable

works, instead it mocked this argument." (<u>Id.</u>) This claim fails for a simple reason: the

alleged promises are directly contradicted by the terms of the Plea Agreement.[12]

---

[12] Moreover, this claim may have been waived, as Defendant never attempted to appeal. <u>See,</u>
<u>e.g.</u>, <u>Jennings v. United States</u>, 696 F.3d 759, 762-63 (8th Cir. 2012) (failure to raise issue on
appeal constitutes procedural default precluding defendant from raising it on collateral attack).
Because the Government has not argued procedural default, however, the Court will address
Claim 1 on the merits.

None of the "promises" Defendant now claims were made – that the Government would "remain mute" at sentencing, explain he was less culpable than White, move for a 3-level reduction for acceptance of responsibility, and not oppose his charitable works – is found anywhere within the Plea Agreement itself.  Furthermore, the Agreement contains an integration clause making abundantly clear the terms thereof constituted "the *entire agreement and understanding* between the United States and the defendant. *There are no other agreements, promises, representations, or understandings*."  (Plea Agreement ¶ 12 (emphases added).)  This proves fatal.  A plea agreement is "contractual in nature and should be interpreted according to general contract principles."  United States v. Sanchez, 508 F.3d 456, 460 (8th Cir. 2007).  As with other contracts, when a plea agreement contains an integration clause expressly disclaiming other agreements or understandings between the parties, that clause will be enforced.  Hence, "[a]n integration clause normally prevents a criminal defendant, who has entered into a plea agreement, from asserting that the government made oral promises to him not contained in the plea agreement itself."  United States v. Leach, 562 F.3d 930, 936 (8th Cir. 2009) (citation omitted).  This is precisely what Defendant is attempting to do here.[13]

Moreover, while the clear, express terms of the Plea Agreement provide a sufficient basis to deny relief, the Court's conclusion is buttressed by Defendant's

---

[13] At several points in his Declaration, Defendant also asserts the Government promised not to argue for a particular sentence, although he does not cite that alleged promise in Claim 1.  Yet, this promise, too, is nowhere found in the Plea Agreement and is inconsistent with its terms, which provide that Defendant "will be sentenced in accordance with 18 U.S.C. § 3551" and that "nothing in the plea agreement should be construed to limit the parties from presenting any and all relevant evidence to the Court at sentencing."  (Plea Agreement ¶¶ 6-7.)

statements under oath during the plea colloquy, confirming that no promises or representations had been made other than those contained in the written Agreement.  (See 2/1/13 Hr'g Tr. at 14 ("MR. RANK:  And lastly, sir, . . . you understand that this is a complete agreement between the United States and yourself.  Do you understand that?  THE DEFENDANT:  Yes.  MR. RANK:  And is it true that there are no other agreements, promises, representations, or understandings that are getting you to plead guilty here today?  THE DEFENDANT:  Right.  MR. RANK:  Is that correct?  THE DEFENDANT:  Yes.").)  As the Supreme Court has noted, "the representations of the defendant [at a plea hearing] . . . constitute a formidable barrier in any subsequent collateral proceedings," because "[s]olemn declarations in open court carry a strong presumption of verity."  Blackledge v. Allison, 431 U.S. 63, 74 (1977).  If defendants could avoid their sworn plea-hearing statements after the fact, they could far too simply unwind plea bargains after buyer's remorse – or a long sentence – had set in.  See Puckett v. United States, 556 U.S. 129, 140 (2009) ("[R]equiring the [defendant to raise an] objection means the defendant cannot game the system, waiting to see if the sentence later strikes him as satisfactory, and then seeking a second bite at the apple by raising the claim.") (internal quotation marks and alterations omitted).  Indeed, the very *purpose* of the plea colloquy is to "uncover hidden promises or representations as to the consequences of a guilty plea."  Zilich v. Reid, 36 F.3d 317, 320 (3d Cir. 1994).  Hence, the defendant's statements at the colloquy "ought not to be lightly cast aside."  Id.; accord, e.g., Nguyen v. United States, 114 F.3d 699, 703 (8th Cir. 1997).

Most fundamentally, though, the Court determines Claim 1 fails because Defendant's allegations are "inherently incredible." Tinajero-Ortiz, 635 F.3d at 1105. Defendant builds his request for relief upon the following house of cards: the Government made numerous promises to him but then omitted those promises from the written Plea Agreement; his counsel, a seasoned criminal practitioner and former Supreme Court law clerk, knew about the promises *and* that they had been omitted from the Plea Agreement, but repeatedly reassured him there was nothing to worry about and the Government would abide by its promises; and defense counsel then stood idly by while the Government's lawyers flouted all of those promises. Simply put, this strains all logic and credulity. Defendant has offered no explanation why the Government would have made numerous promises to him but then omitted them from the Plea Agreement, and there is no obvious reason for it to have done so. Nor has Defendant offered any rational explanation why his experienced counsel would not have objected despite an abundance of opportunities.

Furthermore, and perhaps more damning, Defendant *himself* never objected to the Government's alleged malfeasance – not at the change-of-plea hearing, not in his sentencing papers, not at the sentencing hearing, not in a motion to withdraw his guilty plea, and not on appeal – until the deadline for seeking relief under § 2255 had nearly expired. This despite acknowledging his "reluctance" to sign the Plea Agreement in the first place and the importance of the Government's alleged promises in deciding to plead guilty. Once again, there is no rational explanation why Defendant would fail to object under these circumstances. He is intelligent. He is a college graduate. He is a former

business owner.  He has experience with the criminal-justice system, having previously

been convicted of a federal crime *and* having sought relief under § 2255 *for an alleged*

*breach of a plea agreement by the Government and ineffective assistance of counsel.*  See

Vennes v. An Unknown Number of Unidentified Agents of U.S., 26 F.3d 1448, 1450-51

(8th Cir. 1994).  It simply defies common sense to believe *this* Defendant, given his

history, would have allowed the Government's so-called wrongdoing to proceed

unchecked until long after his criminal case had ended, especially when the allegedly

broken promises supposedly played such a central role in his decision to plead guilty.

See, e.g., United States v. Thompson, 770 F.3d 689, 698 (8th Cir. 2014) (finding it

"significant" the defendant "never sought to withdraw his guilty plea, . . . even after he

received a copy of the PSR" conflicting with his expected sentence).  A far more

reasonable explanation, in this Court's view, is that the promises were never made.[14]

The Court finds Nguyen instructive.  There, the defendant sought relief under

§ 2255 more than 32 months after he pled guilty, 28 months after he had been sentenced,

and 24 months after filing a motion to reduce his sentence with the district court.  114

F.3d at 702.  In support, he submitted a declaration alleging, among other things, that he

received ineffective assistance of counsel and the Government had coerced him into a

---

[14] It is not lost on the Court that Defendant is a convicted fraudster implicated in a scheme
causing hundreds of millions of dollars in losses.  And his attempt to withdraw his guilty plea
due to the Government's alleged breach of its promises does nothing to undermine his admission
of guilt.  See Puckett, 556 U.S. at 137-38 ("[I]t is entirely clear that a breach [of a plea
agreement] does not cause the guilty plea, when entered, to have been unknowing or
involuntary.").

- 19 -

plea.  This Court (Rosenbaum, J.) denied the motion without a hearing, and the defendant

appealed.  The Eighth Circuit affirmed, noting:

> The nature of [the defendant's] allegations shows that, at the time he
> entered the plea, [he] was aware of the bases upon which he now challenges
> his plea.  In that situation one would expect that a defendant promptly
> would make any challenge he had to the propriety of his plea.  Instead, [he]
> waited almost 32 months after his plea and 24 months after he was
> sentenced before challenging the voluntariness of his plea. . . .  *If [the*
> *defendant] believed that he had been denied effective assistance of counsel*
> *and coerced into pleading and that his plea was involuntary, it is difficult to*
> *understand why he waited to raise that issue until he had been released*
> *from confinement.*  Although [he] stated in his § 2255 motion that he had
> "only recently become aware of the significant inadequacies in [his] prior
> representation" and "was unaware of any basis to challenge [his] guilty
> plea," the grounds upon which he seeks to vacate his plea belie those
> assertions.

Id. at 703 (emphasis added).  The same is true here.  By Defendant's own admission, he

knew the Government's so-called promises were not contained in the written Plea

Agreement, and he was aware the Government was breaking the (alleged) promises by, at

the very latest, the date of sentencing.  Yes, Defendant waited until the eleventh hour to

raise the issue.  As in Nguyen, under the circumstances "one would expect [him to]

promptly . . . make any challenge he had to the propriety of his plea."  Id.  That he failed

to do so, in the Court's view, renders his assertions "inherently incredible."

Furthermore, and contrary to Defendant's contentions, Volling's January 30, 2013

letter actually bolsters this conclusion.  Nothing in that letter indicates the Government

had offered, for example, to "stand mute" at sentencing.  Indeed, quite the contrary – the

letter expressly states the Government would "ask the Court to impose a sentence

consistent with the statutory factors" under 18 U.S.C. § 3553(a).  (Decl. Ex. 1.)  Nor does

the letter say anything about the Government not opposing Defendant's charitable works.

(Id.)  Similarly, the letter nowhere provides that the Government had agreed to a *3-level*

reduction for acceptance of responsibility, simply noting Defendant "should receive the

benefit of acceptance of responsibility under the Sentencing Guidelines."  (Id.)  The

Guidelines, however, make clear a defendant obtains a *2-level* reduction for acceptance of

responsibility; an additional point can be obtained only if the defendant "timely notif[ies]

authorities of his intention to enter a plea of guilty."  U.S.S.G. § 3E1.1(b).  There is little

reason to believe such a promise would have been made here, when Defendant pleaded

guilty two years after he was indicted and only four days before his multi-week trial was

scheduled to commence.  At bottom, Volling's letter reinforces the conclusion that the

promises Defendant now alleges were never made.[15]

    The closest Defendant comes to stating a valid due-process claim concerns his

awareness of the underlying Petters fraud, something that *was* expressly addressed in the

Plea Agreement.  (Decl. ¶ 38.)  In particular, Defendant argues the Government breached

the Plea Agreement's statement that he was "not charged with knowledge of the

underlying Petters Ponzi scheme" because the Government "suggested," in "its advocacy

---

[15] As for White, Rank denies promising he would inform the Court the Government deemed
Defendant less culpable (Rank Aff. ¶ 8), but regardless, Defendant told the Court before
sentencing that he "submits, *and the Government agrees*, that his culpability should be judged
less than that of Robert White, and the resulting sentence that [he] receives should reflect that
judgment."  (Doc. No. 244 at 29 (emphasis added).)  The Government did not argue to the
contrary in its Reply (Doc. No. 283).  Hence, even assuming the promise was made and was
breached, it would not be actionable here.  See, e.g., Campbell v. Smith, 770 F.3d 540, 547 (7th
Cir. 2014) ("[W]here the breach is insubstantial, immaterial, technical, or even cured, a
defendant is entitled to no relief."); see also Santobello v. New York, 404 U.S. 257, 261-63
(1971) (prosecution's breach of plea agreement *may* entitle defendant to relief, but declining to
adopt a *per se* rule).

at sentencing," that "due to [his] position as intermediary between Petters and [other co-conspirators], [he] had reason to suspect the underlying Petters fraud."  (Id.)

To be sure, the Government is held to the terms of a plea agreement to the same extent as a defendant, and hence it cannot take steps amounting to an end run around the agreement.  See, e.g., United States v. Mitchell, 136 F.3d 1192, 1194 (8th Cir. 1998).  But the Court does not believe the Government did so here.  The Plea Agreement makes clear Defendant was *not* charged with the Ponzi scheme (Plea Agreement ¶ 2 at 3 ("Defendant is not charged with knowledge of the underlying Petters Ponzi scheme"); id. at 7 ("Without knowledge of the . . . massive Ponzi scheme orchestrated by Petters . . ."), and its sentencing papers harmonized with that position.  (See Doc. No. 241 at 3 ("The government has never alleged that Vennes was aware of the full extent of the Petters Ponzi scheme – i.e., that the purported transactions between [Petters Company Inc.] and the Big Box Retailers were wholly fictitious.  In this way, his conduct in this case is different.").)  Moreover, suggesting Defendant had reason to *suspect* the underlying fraud is a far cry from actually charging him with knowledge of it.  Simply put, the Court's review of the record leaves it satisfied the Government did not violate the terms of the Plea Agreement.

For all of these reasons, Claim 1 fails.

## II.   Ineffective assistance (Claims 2 and 3)

In Claim 2, Defendant asserts Volling was ineffective "at the sentencing hearing, and in his presentence written advocacy, by not objecting to the Government's violations of the promises made to induce the guilty plea."  (Decl. ¶ 42.)  In Claim 3, he asserts

Volling rendered ineffective assistance by misinforming him about his possible sentence and threatening to withdraw if he did not plead guilty. (Id. ¶ 48.) Claim 3 also reiterates portions of Claim 1, specifically with respect to the Government remaining mute at sentencing and informing the Court Defendant was less culpable than White, and hence need not be separately discussed. (Id.)

The Sixth Amendment guarantees criminal defendants the right to effective assistance of counsel, e.g., Chesney v. United States, 367 F.3d 1055, 1058 (8th Cir. 2004), and that right extends to plea negotiations, e.g., Missouri v. Frye, __ U.S. __, 132 S. Ct. 1399, 1408-09 (2012); Hill v. Lockhart, 474 U.S. 52, 57 (1985). Generally speaking, an allegation that trial counsel was ineffective falls within the "narrow range" of matters that may be raised in a § 2255 proceeding. See, e.g., United States v. McAdory, 501 F.3d 868, 872 (8th Cir. 2007). Such a claim is governed by the two-part test enunciated in Strickland v. Washington, 466 U.S. 668 (1984), under which a defendant must show (1) his attorney's performance was deficient and (2) the deficiency prejudiced him. Tinajero-Ortiz, 635 F.3d at 1103. In the guilty-plea context, this means a defendant must show his counsel's conduct "fell below an objective standard of reasonableness" and that there exists "a reasonable probability that, but for counsel's errors, he would not have [pled] guilty and would have insisted on going to trial." Id. (citations omitted).

## A.    Defendant expressed no concerns with Volling's performance

At the outset, a fundamental problem undermines Defendant's ineffective-assistance claims: he stated that he was satisfied with Volling's performance. At the

change-of-plea hearing, the Court specifically asked whether Defendant was satisfied with Volling's representation and he replied, "Completely." (2/1/13 Hr'g Tr. at 4.) In fact, when he had questions about the Plea Agreement at that hearing, a pause in the proceedings was taken so he could address those questions with Volling (id. at 21-22), and when the Court later inquired if Volling was "able to answer [your] questions to your satisfaction," Defendant replied, "Fully." (Id. at 34.)

This is critical. The Eighth Circuit has repeatedly recognized that a defendant's "failure to assert any objections to his counsel's performance at the change-of-plea hearing, despite his knowledge of the availability of a defense, refutes any claim of ineffective assistance of counsel as a basis for withdrawing his plea." United States v. Norvell, 729 F.3d 788, 796 (8th Cir. 2013) (quoting United States v. Murphy, 572 F.3d 563, 569 (8th Cir. 2009)); accord, e.g., Nguyen, 114 F.3d at 704 ("Nguyen's belated claim that his counsel had not represented him effectively is flatly contradicted by his contemporaneous statements at the plea hearing that he was 'satisfied with the representation [he had] received' and that he 'believed' that his counsel had 'been a good lawyer'"); United States v. Newson, 46 F.3d 730, 733 (8th Cir. 1995). Here, Defendant's statements regarding Volling's performance took place *after* he had signed the Plea Agreement knowing it did not contain any of the so-called promises he now cites in an effort to obtain relief. In fact, they came after Volling had purportedly, and angrily, threatened to withdraw from Defendant's representation. Under these circumstances, Defendant's "belated assertion" of ineffective assistance is simply "not credible." United States v. Wilson, 955 F.2d 547, 552 (8th Cir. 1992). Rather, it appears Defendant is

attempting to throw his counsel under the bus, so to speak, in a half-hearted attempt at avoiding a lengthy sentence.

In any event, the Court finds additional problems with Defendant's ineffective-assistance claims, as discussed below.

**B.    Claim 2**

Claim 2 asserts Volling was ineffective by failing to object when the Government broke its alleged promises.  But the Court has already determined that Defendant's assertions regarding those promises are "inherently incredible" – it does not believe the promises were ever made.  Counsel cannot have been ineffective for standing silent when the Government "failed" to keep mythical promises.  See, e.g., Campbell v. Smith, 770 F.3d 540, 547 (7th Cir. 2014) ("[I]f there was no breach [of the plea agreement] . . . defense counsel's failure to object was not ineffective assistance.").

Nor does the Court believe Defendant can establish Strickland prejudice by showing that, absent Volling's "ineffectiveness," he would not have pleaded guilty and instead gone to trial.  Tinajero-Ortiz, 635 F.3d at 1103.  Once again, the timing is critical. It is undisputed the Government and Defendant had no discussions about a possible plea deal for nearly two years after Defendant was indicted.  That all changed on the eve of trial, shortly after the Government produced its Jencks Act disclosures and trial exhibits. The weight of the Government's evidence had an undeniable effect – as Defendant recalls, Volling described it as a "damn howitzer" and made clear that the consequences of a conviction on all of the charges "would be dire."  (Decl. ¶ 15.)  Indeed, conviction on all 28 Counts likely would have resulted in a sentence that, no matter its length, would

have effectively constituted life imprisonment, given that Defendant was 55 years old at the time.  (See also supra note 2.)  Pleading guilty to one Count of securities fraud and one Count of money laundering, however, limited Defendant's total exposure to a maximum of 15 years and resulted in the dismissal of 26 charges against him.  (See also Decl. ¶ 24 (acknowledging that under the Plea Agreement, Defendant was "avoiding the risk of a long sentence").)  Under these circumstances, the Court simply does not believe Defendant would have rejected this deal, no matter what additional promises the Government supposedly made or Volling's failure to object when the Government allegedly broke them.  See, e.g., Covington v. United States, 739 F.3d 1087, 1090 (8th Cir. 2014) (rejecting ineffective-assistance claim due to lack of prejudice where defendant did not show "that going to trial would have resulted in a lower sentence," since "in exchange for [his] guilty plea, the government agreed to dismiss the remaining forty-seven counts of the indictment"); Thomas v. United States, 27 F.3d 321, 326 (8th Cir. 1994) (weight of government's evidence and likely significant sentence defendant would have received following conviction undermined ineffective-assistance claim based on counsel's alleged failure to properly advise defendant in connection with plea).

Defendant also argues, in the alternative, that he should be *resentenced* as a result of Volling's ineffectiveness, rather than being permitted to *withdraw his guilty plea*.  (See Decl. ¶ 45.)  Such a request is equally meritless, however, because Defendant has not shown he would have received a lower sentence if Volling had objected to the Government's (so-called) broken promises.  Indeed, Defendant acknowledges (as he did at sentencing (see 10/18/13 Hr'g Tr. at 30)) that the Guidelines calculation called for a

15-year sentence and would have been significantly higher were the Court's hands not tied by the statutory-maximum penalties.  Given the staggering amount of losses involved and Vennes's prior criminal history, the Court would not have been inclined to vary downward from a Guidelines sentence even if, for example, the Government informed the Court it believed Defendant had been less culpable than White.  Indeed, the Court noted as much at sentencing.  (See id. at 32-33 (recognizing Defendant's criminal history and pointing out that Defendant's sentence was "not out of sync" with others, including those involved in the Petters case, such as White; "You can look at individuals in the Petters situation who have got[ten] very light sentences *but there are reasons for that. And those reasons do not obviously exist here.*") (emphasis added).)

### C.    Claim 3

Claim 3 alleges Volling rendered ineffective assistance "by estimating a sentencing range of 3 to 7 years" and by "threatening to withdraw as counsel if he did not plead guilty."  (Decl. ¶ 48.)  Each contention lacks merit.

#### i.    Sentence estimate

It is undisputed Volling informed Defendant that he "believe[d] there is a likelihood that a sentence at the low end of three years and the high end of seven years could be imposed by the Court."  (Decl. Ex. 1.)  He further advised that he believed "a sentence of less than five years is a real possibility."  (Id.)  And, he advised Defendant that he believed consecutive maximum sentences on the two charges to which Defendant was pleading guilty was "unlikely."  (Id.)

Notwithstanding Volling's advice, however, Defendant was quite aware a fifteen-year sentence was a legitimate prospect.  Indeed, even before he signed the Plea Agreement, Defendant "feared the possibility of a fifteen year sentence."  (Decl. ¶ 15.)  But lest there have been any doubt, the Plea Agreement made explicit that the statutory maximum penalty was 15 years (Plea Agreement ¶ 4) and that the parties' preliminary calculations under the Sentencing Guidelines brought "the defendant's sentence . . . to the statutory maximum in this case, which is 180 months."  (Id. ¶ 6.)  Then, at the plea hearing, Defendant acknowledged having read ("more than twice") the Plea Agreement and understanding its terms, including the statutory maximum penalties and the initial Guidelines calculation, and the Court reiterated that he would be sentenced in accordance with the Guidelines, that the maximum possible sentence was 15 years, and in "the worst case scenario," he would be sentenced to that term of imprisonment and have no right to appeal or withdraw his guilty plea.  (2/1/13 Hr'g Tr. at 5, 7-8, 34-38.)[16]

This scuttles Defendant's claim.  It has long been recognized in this Circuit that as "long as the district court tells a defendant the statutory range of punishment that he faces and informs him that the sentencing guidelines will be used in determining the ultimate sentence, the plea is binding.  *This is true even where the misunderstanding is caused by defense counsel's erroneous estimation of what the ultimate sentence will be.*"  United

---

[16] In addition, and as discussed at length above, Defendant averred at the plea hearing that "no other . . . promises, representations, or understandings" beyond those in the Plea Agreement were made to "get [him] to plead guilty."  (2/1/13 Hr'g Tr. at 14.)  Indeed, Defendant was specifically advised at the hearing that the Court did not know – and *could not know* at that juncture – what his sentence might be.  (Id. at 36.)  And so he was pointedly asked, "Has anybody told you what your sentence is going to be?"  Defendant responded, "No."  (Id. at 36-37.)

States v. Ramirez-Hernandez, 449 F.3d 824, 826 (8th Cir. 2006) (emphasis added).  In other words, a defendant cannot show he was prejudiced from his attorney's advice, no matter how inaccurate it might have been, if the district court essentially cures that inaccurate advice by correctly informing the defendant of his potential sentence.  See, e.g., Norvell, 729 F.3d at 795 (no ineffective assistance from counsel's erroneous advice concerning potential sentence that might result from guilty plea where judge clearly explained maximum possible sentence to defendant at plea hearing); United States v. Nesgoda, 559 F.3d 867, 870 n.2 (8th Cir. 2009) ("[C]ounsel's incorrect estimate of a sentencing range was not ineffective assistance of counsel."); Matthews v. United States, 114 F.3d 112, 114 (8th Cir. 1997); Thomas, 27 F.3d at 326.

This ineffective-assistance claim is indistinguishable from the one asserted in Tinajero-Ortiz.  There, the defendant claimed his attorney had told him that he would receive a five-year sentence in exchange for pleading guilty to a drug charge.  635 F.3d at 1102.  The written plea agreement, however, provided that there was a statutory minimum sentence of five years and a statutory maximum sentence of 40 years, and it further provided the Government would simply recommend a sentence at the low end of the Guideline range, whatever it might be.  Id.  At his plea colloquy, the defendant informed the court he had read and discussed the agreement with his attorney, that he understood its terms, that it represented the entire agreement with the Government and there were no separate promises, and that he knew his sentence ultimately would be up to the court.  Id.  He raised no objection to the PSR's calculation of a 120-to-150 month

Guideline range, nor did he object at sentencing when the court adopted that calculation

and sentenced him to 120 months' imprisonment.  Id.

Nevertheless, the defendant then sought relief under 28 U.S.C. § 2255, asserting

counsel had been ineffective by "misleading" him and telling him that he would receive a

sentence of five years.  The district court rejected this claim without a hearing in light of

the plea agreement and plea colloquy, and the Eighth Circuit affirmed:

> We agree that Tinajero-Ortiz cannot prevail on his claims in respect to
> counsel's representation during plea negotiations or at the sentencing phase
> because he has not shown Strickland prejudice. . . . Tinajero–Ortiz has not
> shown that he "would not have [pled] guilty and would have insisted on
> going to trial" absent his attorney's misrepresentations.   At numerous
> presentencing points the government and the district court informed
> Tinajero-Ortiz that he could be sentenced to as many as forty years, that his
> advisory guideline range would not be determined until after the PSR was
> completed, and that the final range might differ from what his attorney told
> him.  Petitioner himself raised no objection at sentencing to the guideline
> range adopted by the court or to its 120 month sentence.
>
> This case closely resembles [United States v.] Regenos, [405 F.3d 691 (8th
> Cir. 2005)], where we held that a petitioner's claim of ineffective assistance
> of counsel failed "because she cannot prove that the result of the plea
> negotiations would have been different had her counsel performed
> adequately." 405 F.3d at 693.  Because allegedly omitted information had
> been "fully supplied to [the petitioner] throughout the plea process" and the
> district court had "explicitly informed" the petitioner of the potentially
> applicable sentences during the plea colloquy, the Regenos petitioner failed
> to prove Strickland prejudice.  *Here, the government and the district court
> informed Tinajero-Ortiz multiple times that his statutory sentencing range
> was between five and forty years and that his advisory guideline range
> could be different from what his attorney had predicted.  Tinajero-Ortiz has
> thus failed to meet the burden of proving Strickland prejudice.*

Tinajero-Ortiz, 635 F.3d at 1104-05 (emphasis added) (citations omitted).

The same result should obtain here.  At bottom, it makes no difference how

erroneous Volling's advice might have been, because Defendant was advised and fully

aware he could receive a 15-year sentence.  Hence, he cannot show he was prejudiced by Volling's advice, and his ineffective-assistance claim fails.

> ### ii.    Threat to withdraw

Defendant next asserts Volling rendered ineffective assistance by threatening to withdraw if he did not plead guilty.  (Decl. ¶ 47.)  There are two problems with this claim.

First, for many of the reasons already discussed, the Court does not believe the alleged threat actually happened.  Volling, of course, denies it.  (See supra note 3.)  Moreover, prior to filing the instant Motion, Defendant never claimed Volling had coerced him into pleading guilty or threatened him, and at the change-of-plea hearing – which took place *after* the alleged threat – Defendant represented that he was "completely" satisfied with Volling's representation.  And, Defendant answered in the negative when the Court asked, "Did anybody make any *threats* or promises to get you to enter into this particular plea agreement?"  (2/1/13 Hr'g Tr. at 34 (emphasis added).)

Even assuming the alleged threat occurred, however, Defendant's claim fails. United States v. Abdallah, 947 F.2d 306 (8th Cir. 1991), is instructive.  There, the defendant appealed the denial of a motion to withdraw his guilty plea, arguing he had received ineffective assistance and pleaded guilty only "under duress" because "his attorney pressured him into pleading guilty."  Id. at 312.  The Eighth Circuit rejected that argument, noting the defendant stated at the plea hearing "that he was completely satisfied with the performance of his counsel and never indicated in any manner that he was under pressure from counsel to plead guilty."  Id.  The "failure to assert any

objections to counsel's performance at the [plea] hearing," noted the Eighth Circuit, "refutes any claim of ineffective assistance of counsel as a basis for withdrawing his plea[]."  Id.; accord, e.g., Murphy, 572 F.3d at 569; United States v. Payton, 260 F.3d 898, 900 (8th Cir. 2001); Newson, 46 F.3d at 733.  So too here.

Finally, and assuming *arguendo* the alleged withdrawal threat occurred, the Court fails to perceive any prejudice sufficient to satisfy Strickland.  The tenor of Defendant's claim is that Volling's threat to withdraw rendered his guilty plea involuntary, because he "did not have access to funds to hire a different lawyer and would have to defend [him]self at trial without a lawyer to represent" him.  (Decl. ¶ 19; accord, e.g., id. ¶ 23 (asserting guilty plea resulted from "knowing that if [he] did not plead guilty, [he] would likely have to represent [him]self at trial").)  But this simply defies common sense and, more importantly, conflicts with the record.

Initially, the Court finds it extremely difficult to swallow that Defendant possibly believed he could be forced to defend himself at trial if Volling withdrew.  Popular culture suggests Defendant was aware of the common Miranda refrain, "If you can't afford a lawyer, one will be appointed for you."  See, e.g., Maldonado v. Greiner, No. 01 Civ. 0799, 2003 WL 22435713, at *18 (S.D.N.Y. Oct. 28, 2003) (Report & Recommendation of Peck, M.J.) ("The Miranda warnings are familiar to everyone from watching television or movies:  'Miranda has become embedded in routine police practice to the point where the warnings have become part of our national culture.'") (quoting Dickerson v. United States, 530 U.S. 428, 443 (2000)); see also Doody v. Ryan, 649 F.3d 986, 1026 (9th Cir. 2011) (*en banc*) ("At least an un-warned suspect may know

his rights without being told about them; many non-lawyers watch *Cops* and *Law and Order*."). Indeed, it is difficult to conceive Defendant was not reminded of this right when he was arrested.

But the Court need not hazard to guess, for the record makes clear Defendant was aware of his right to free counsel. Defendant appeared before Magistrate Judge Graham on May 3, 2011, for an initial appearance shortly after his arrest. At that time, he was specifically and expressly advised that he had "the right to have an attorney represent you throughout all of the[] proceedings. And if you can't afford an attorney . . . then one would be appointed to you free of charge by the Court." (5/30/11 Hr'g Tr. at 3.) Accordingly, his claim that he was coerced into pleading guilty because he feared being forced to represent himself at trial contradicts the record and simply cannot stand.

## III.    Involuntary plea (Claim 4)

Defendant's final claim does not merit extended discussion, as it is largely duplicative of Claim 3. He asserts in Claim 4 that Volling's alleged threat to withdraw rendered his plea involuntary, entitling him to withdraw the plea separate and apart from any ineffective assistance. (Decl. ¶ 51.) The Court has already determined, however, that the threat never occurred and if it did, it would not entitle Defendant to withdraw his plea. Claim 4 therefore lacks merit.

## IV.    Evidentiary hearing and discovery

Defendant contends he is entitled to an evidentiary hearing on his Motion. As noted above, § 2255 provides that "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief, the court shall . . . grant a

prompt hearing thereon, determine the issues and make findings of fact and conclusions of law with respect thereto." 28 U.S.C. § 2255(b). And when determining whether the files and records of the case "conclusively show that the prisoner is entitled to no relief," a court generally must accept as true the prisoner's allegations but need not accept allegations "contradicted by the record, inherently incredible, or conclusions rather than statements of fact." Tinajero-Ortiz, 635 F.3d at 1105.

Suffice it to say, the Court finds nearly all of Defendant's allegations either inherently incredible (such as the secret side promises allegedly made by the Government) or contradicted by the record (such as his fear of being forced to trial without representation). For the reasons already provided, the Court does not believe an evidentiary hearing is necessary, and it declines to hold one. The Court need not hold a hearing to determine, for example, "whether Rank actually made the promises articulated in Volling's January 30, 2013 letter" (Def. Reply (Doc. No. 394) at 8) because even if the promises were made, Defendant is foreclosed from relief due to the express – and contrary – terms of the Plea Agreement. Nor is a hearing necessary for the Court to evaluate "whether Volling threatened to withdraw as counsel" (id.), as Claims 3 and 4 fail regardless. See Blackledge, 431 U.S. at 80 n.19 (habeas petitioner seeking relief by contradicting his sworn, in-court statements is entitled to a hearing "only in the most extraordinary circumstances"); Tinajero-Ortiz, 635 F.3d at 1106 (affirming denial of § 2255 motion without hearing where defendant's "plea agreement, the plea colloquy, and the sentencing hearing sufficiently refute his claims"); Nguyen, 114 F.3d at 703 (same).

Defendant also claims he is entitled to discovery "based on the divergent factual allegations between [his] claims, the Government's position, and Volling's affidavit." (Doc. No. 395 at 1.)  The Court disagrees.  A "habeas petitioner, unlike the usual civil litigant in federal court, is not entitled to discovery as a matter of ordinary course." Bracy v. Gramley, 520 U.S. 899, 904 (1997).  Rather, he must obtain leave of Court, which will be granted only "for good cause."  Rule 6(a), Rules Governing § 2255 Proceedings for the United States District Courts.  Hence, "[f]ederal habeas discovery is the exception rather than the rule."  Prentice v. Baker, No. 3:10-cv-00743, 2013 WL 1182065, at *2 (D. Nev. Mar. 19, 2013).

The Court perceives no good cause here.  In Bracy, the Supreme Court counseled that good cause exists only when a habeas petitioner has made "specific allegations . . . show[ing] reason to believe that [he] may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief."  520 U.S. at 908-09.  For the reasons already stated, the Court does not believe discovery into what Volling told Defendant, whether the Government made the alleged side promises or what their terms might have been, or any of the other matters into which Defendant seeks to delve in discovery would aid him in showing he is entitled to relief.  Simply put, discovery is unwarranted.

## V.     No Certificate of Appealability will issue

Finally, the Court anticipates Defendant will seek appellate review of this Order. To appeal a final order in a proceeding under § 2255, a defendant must obtain a Certificate of Appealability.  28 U.S.C. § 2253(c)(1)(B).  A district court cannot grant a Certificate of Appealability unless the defendant "has made a *substantial showing* of the

denial of a constitutional right." § 2253(c)(2) (emphasis added); accord, e.g., Williams v. United States, 452 F.3d 1009, 1014 (8th Cir. 2006). A Certificate of Appealability will not issue simply because an appeal might be pursued in good faith, raising non-frivolous issues. See Kramer v. Kemma, 21 F.3d 305, 307 (8th Cir. 1994) ("Good faith and lack of frivolousness, without more, do not serve as a sufficient bases for issuance of a certificate under 28 U.S.C. § 2253."). Rather, the movant must show the issues are "debatable among reasonable jurists," that different courts "could resolve the issues differently," or that the issues otherwise "deserve further proceedings." Cox v. Norris, 133 F.3d 565, 569 (8th Cir. 1997).

Defendant cannot meet this exacting standard here. His claims have been fully addressed and lack merit; the Court does not believe they are "debatable among reasonable jurists." Id. at 568. Defendant has not shown sufficient reason to believe any other court – including the Eighth Circuit – would decide this case any differently than it was decided here. And, he has not identified, and the Court cannot independently discern, anything novel, noteworthy, or worrisome about his case warranting appellate review.

## CONCLUSION

In the end, the Court agrees with the Government that accepting Defendant's contentions here would "turn [his] change-of-plea colloquy into a farce." United States v. Alegria, 192 F.3d 179, 186 (1st Cir. 1999). The Court will not countenance such a result. Simply put, no constitutional or other infirmity entitles Defendant to relief.

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS ORDERED** that Defendant's Motion under 28 U.S.C. § 2255 (Doc. No. 377) is **DENIED**.  His Motion for discovery (Doc. No. 395) also is **DENIED**.  The Court **DECLINES** to issue a Certificate of Appealability.

**LET JUDGMENT BE ENTERED ACCORDINGLY** in Civil No. 14-4202.


Date:  April 29, 2015                          s/Richard H. Kyle
                                               RICHARD H. KYLE
                                               United States District Judge